IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JESUS SILVA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-07-1249 |
| | § | |
| CONTINENTAL AIRLINES, INC., | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM OPINION**

Pending before the court[1] is Defendant's Motion for Summary Judgment (Docket Entry No. 17). The court has considered the motion, all relevant filings, and the applicable law. For the reasons set forth below, the court **DENIES** Defendant's motion.

**I.  Case Background**

Plaintiff initiated this action against his employer for retaliation under the Railway Labor Act[2] ("RLA"). Plaintiff claims that Defendant retaliated against him for engaging in union activity. More specifically, Plaintiff alleges that Defendant retaliated with regard to the manner of an investigation into harassment charges alleged against him and, as a result of the investigation, by suspending him, referring him to Defendant's Employment Assistance Program ("EAP"), and requiring him to sign an undated letter of resignation.

---

[1]   The parties consented to proceed before the undersigned magistrate judge for all proceedings, including trial and final judgment, pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73.  Docket Entry No. 13.

[2]   45 U.S.C. §§ 151–188.

Since 1997, Plaintiff has been employed by Defendant as a material specialist for aircraft maintenance.[3]  As a material specialist, Plaintiff is responsible for responding to the mechanics' material needs, shipping and receiving materials from vendors, and shipping hazardous airplane equipment.[4]

Friction between Plaintiff and his supervisor, Dale Meade ("Meade"), surfaced around April or May 2006.[5]  In June 2006, the two argued, in front of other workers, about paperwork Plaintiff needed that was locked in Meade's desk.[6]  Viewing Plaintiff's behavior as "boisterous and disrespectful," Meade took Plaintiff aside and castigated him for bringing up the issue in front of the others and, thus, making Meade look bad.[7]  The altercation

---

[3]   See Plaintiff's Response to Defendant's Motion for Summary Judgment, Docket Entry No. 20, ("Plaintiff's Response"), Ex. 1, Plaintiff's deposition, pp. 14, 15, 18.

[4]   Id. at pp. 18-19.

[5]   See id. at pp. 39-47; Defendant's Motion for Summary Judgment, Docket Entry No. 17, ("Defendant's Motion"), Ex. 1, Plaintiff's deposition, Attach. 3, letter from Plaintiff to David Kapinos ("Kapinos") dated June 5, 2006, pp. 2-4 (unnumbered).

[6]   See Defendant's Motion, Ex. 1, Plaintiff's deposition, Attach. 3, letter from Plaintiff to Kapinos dated June 5, 2006, pp. 1-2 (unnumbered); Plaintiff's Response, Ex. 1, Plaintiff's deposition, pp. 22, 25-26.

[7]   See Defendant's Motion, Ex. 1, Plaintiff's deposition, Attach. 2, letter from Kapinos to Plaintiff dated June 7, 2006; Attach. 3, letter from Plaintiff to Kapinos dated June 5, 2006, pp. 1-2 (unnumbered); Plaintiff's Response, Ex. 1, Plaintiff's deposition, pp. 24-26.

escalated in Meade's office, culminating when Meade collected Plaintiff's work badge and sent him home.[8]

Defendant held Plaintiff out of work pending a fact-finding hearing, which occurred a few days later.[9]  The warehouse manager, David Kapinos ("Kapinos"), found Plaintiff's behavior to be "very serious and in violation of the Working Together Guidelines," in particular, the directive to respect leadership.[10]  Kapinos officially suspended Plaintiff without pay for the time he already had missed since being sent home.[11]  Plaintiff acknowledged receipt of a letter detailing the incident and the disciplinary action.[12] The letter was to remain in his file for eighteen months.[13]

The letter concluded, "You are further reminded that any future violations of Company rules or polic[i]es may result in more severe disciplinary action, up to an[d] including termination."[14] Even though Plaintiff apologized, he disagreed with his supervisor's opinion and thought the hearing was unfair because

---

[8]    See Defendant's Motion, Ex. 1, Plaintiff's deposition, Attach. 3, letter from Plaintiff to Kapinos dated June 5, 2006, p. 2 (unnumbered); Plaintiff's Response, Ex. 1, Plaintiff's deposition, pp. 26-30, 33.

[9]    See Defendant's Motion, Ex. 1, Plaintiff's deposition, Attach. 2, letter from Kapinos to Plaintiff dated June 7, 2006.

[10]    Id.

[11]    See id.

[12]    See id.

[13]    See id.

[14]    Id.

those in charge did not listen to his account of the altercation.[15]
Plaintiff documented his side of the story in a letter that he
submitted to Kapinos.[16]

Plaintiff continued to have problems with management and
sought advice through Defendant's EAP.[17]  Apparently, Plaintiff
achieved some success in improving relations with management as the
record reflects that no other conflicts arose during the remainder
of 2006 and into 2007.  On February 1, 2007, though, Plaintiff
again sought the assistance of Defendant's EAP, complaining that he
was "[s]tressed out over interactions with one particular
supervisor," especially one encounter that had occurred a week
earlier.[18]  Plaintiff reported that he had called in sick for a week
since that incident.[19]

On February 16, 2007, Plaintiff and Roger Marcum ("Marcum"),
a material specialist, met with union representatives to discuss
organizing material specialists employed by Defendant who worked at
George H.W. Bush Intercontinental Airport in Houston.[20]  Defendant

---

[15]    See id.; Plaintiff's Response, Ex. 1, Plaintiff's deposition, p. 30.

[16]    Defendant's Motion, Ex. 1, Plaintiff's deposition, Attach. 3, letter
from Plaintiff to Kapinos dated June 5, 2006.

[17]    Plaintiff's Response, Ex. 1, Plaintiff's deposition, pp. 73-74.

[18]    Defendant's Reply, Docket Entry No. 22, Ex. 2, Clinical Assessment,
p. 1 (numbered p. 6).

[19]    See id.

[20]    Plaintiff's Response, Ex. 1, Plaintiff's deposition, pp. 62, 63; Ex.
2, Plaintiff's affidavit, ¶ 3; Ex. 3, Marcum's affidavit, ¶ 3.

had a no-solicitation policy that prohibits solicitation of other employees "in the workplace, whether through communication or fundraising, without authorization."[21]   A couple of days later, Plaintiff discussed union organization with Kim Green ("Green"), also a material specialist.[22]

On February 19, 2007, Green complained to Farrell that Plaintiff was pressing her to support union organization and, then, was spreading a false rumor that she had reported to management that some of the employees were organizing a union.[23]   Her claim prompted a meeting that same day between Plaintiff, who was accompanied by a coworker, and Human Resources Manager Jim Farrell ("Farrell") and Supervisor Elio Torres ("Torres").[24]   Farrell and Torres confronted Plaintiff, representing to Plaintiff that Green had complained that Plaintiff spread a rumor that Green was organizing a union.[25]   Plaintiff told them that he was involved with the union, not Green, and that he was not spreading rumors about

---

[21]     Defendant's Motion, Ex. 2, Farrell's affidavit, ¶ 4 (unnumbered), Attach. 3, Working Together Expectations.

[22]     See Plaintiff's Response, Ex. 1, Plaintiff's deposition, pp. 76-77; Ex. 3, Marcum's affidavit, ¶ 4.

[23]     See Defendant's Motion, Ex. 2, Farrell's affidavit, ¶ 2 (unnumbered); Ex. 3, Green's affidavit, ¶ 2 (unnumbered); Plaintiff's Response, Ex. 1, Plaintiff's deposition, pp. 50-51, 53, 57-58.

[24]     See Defendant's Motion, Ex. 2, Farrell's affidavit, Attach. 1, Feb. 19, 2007, meeting notes; Plaintiff's Response, Ex. 1, Plaintiff's deposition, pp. 50-51; Ex. 2, Plaintiff's affidavit, ¶ 4.

[25]     See Plaintiff's Response, Ex. 1, Plaintiff's deposition, p. 53.

her.[26]  He admitted confronting her "as a friend" when he heard that she had told management that some material specialists were planning to unionize, and she denied making any report to management.[27]  Plaintiff apologized to Green for upsetting her.[28]

When Plaintiff opened his work vehicle the following day, Plaintiff discovered a defaced work form leaning against his brake pedal.[29]  The form was one that Plaintiff had left as instructions for the swing-shift material specialists, but someone had written "fuckin tires" in the description section.[30]  The usual procedure was to discard a form after completion of the job detailed on it.[31]  Plaintiff reported the incident to his supervisors.[32]

The additional stress caused by the vulgar note and Green's complaint exacerbated Plaintiff's high-blood-pressure condition.[33]  Plaintiff requested and received permission from Kapinos to take

---

[26]   Id. at pp. 54, 63-64.

[27]   See Defendant's Motion, Ex. 2, Farrell's affidavit, ¶ 2 (unnumbered); Attach. 1, Feb. 19, 2007, meeting notes; Plaintiff's Response, Ex. 1, Plaintiff's deposition, p. 58.

[28]   See Defendant's Motion, Ex. 2, Farrell's affidavit, Attach. 1, Feb. 19, 2007, meeting notes.

[29]   Plaintiff's Response, Ex. 1, Plaintiff's deposition, pp. 86, 89; Ex. 2, Plaintiff's affidavit, ¶ 5.

[30]   Plaintiff's Response, Ex. 2, Plaintiff's affidavit, ¶ 5; see also id. at Ex. 1, Plaintiff's deposition, pp. 87-88.

[31]   Plaintiff's Response, Ex. 2, Plaintiff's affidavit, ¶ 5; see also id. at Ex. 1, Plaintiff's deposition, pp. 88, 89.

[32]   See Plaintiff's Response, Ex. 1, Plaintiff's deposition, pp. 86-87.

[33]   Plaintiff's Response, Ex. 2, Plaintiff's affidavit, ¶ 5.

off for the remainder of the day.[34]  Later that day, Plaintiff's wife took him to Defendant's health clinic.[35]  On February 21, 2007, he returned to the clinic for a follow-up appointment and missed work.[36]

Plaintiff did not return to work until Sunday, February 25, 2007, after his regularly scheduled days off.[37]  On Monday morning, Farrell called Plaintiff into a meeting to discuss Green's complaint.[38]  At that meeting, Green joined Farrell, Torres, and Plaintiff, along with one representative each for Green and Plaintiff.[39]  Marcum attended as Plaintiff's representative.[40] Farrell conducted the meeting and recorded what occurred:

> I opened the meeting by stating that there was a large discrepancy between [Green]'s and [Plaintiff's] statements.  Further, I added that I had spoken to Danny Theriault [("Theriault")] and he had stated that [Plaintiff] had come to him and had questioned him about other coworkers['] involvement in going to management about a union on the property.  Danny had added that he was not concerned with the issue and did tell [Plaintiff] that George Carson, [Green] and Arnulfo Orozco did know

---

[34]     Id.

[35]     Id.

[36]     Id. at ¶ 6.

[37]     Id. at ¶¶ 7, 8.

[38]     Id. at ¶ 9; Defendant's Motion, Ex. 2, Farrell's affidavit, ¶ 2 (unnumbered); see also Plaintiff's Response, Ex. 1, Plaintiff's deposition, pp. 59-60.

[39]     See Plaintiff's Response, Ex. 1-A, Feb. 26, 2007, meeting notes, p. 1; Ex. 2, Plaintiff's deposition, pp. 57, 83.

[40]     Plaintiff's Response, Ex. 1-A, Feb. 26, 2007, meeting notes, p. 1; Ex. 2, Plaintiff's deposition, p. 57.

about the union issue, but Danny, at no time, told [Plaintiff] that [Green] had told management. As far as Danny was concerned, management was aware of a union drive and had no opinion one way or the other on it. All Danny knew was that Warehouse Manager Dave Kapinos informed the workforce that any union drive had to be conducted off the property.[41]

Plaintiff gave his account of his interaction with Green, and, according to Plaintiff, Green agreed that it was accurate.[42] Green complained that Plaintiff "kept harping on the fact that [Theriault] had told him that [Green] had gone to management about a union drive."[43] Plaintiff apologized for broaching the subject with Green, but continued to deny that he had spread any rumor about her.[44] Green insisted that Plaintiff was lying.[45]

Farrell told the group that he would investigate the complaint and notify everyone of the results.[46] He added that he had been a union officer and had no problem working with a unionized

---

[41]   Plaintiff's Response, Ex. 1-A, Feb. 26, 2007, meeting notes, p. 1.

[42]   Plaintiff's Response, Ex. 1, Plaintiff's deposition, p. 83. Green's view differed from Plaintiff's: "[Plaintiff] tried to convince management that the situation was all a misunderstanding and that he and I had resolved everything between us. That was not the case, and I informed those investigating that I did not agree with [Plaintiff's] position." Defendant's Motion, Ex. 3, Green's affidavit, ¶ 2 (unnumbered).

[43]   Plaintiff's Response, Ex. 1-A, Feb. 26, 2007, meeting notes, p. 1.

[44]   See id.; Plaintiff's Response, Ex. 1, Plaintiff's deposition, pp. 58-60, 83.

[45]   See Plaintiff's Response, Ex. 1-A, Feb. 26, 2007, meeting notes, p. 1.

[46]   Id.

8

workforce, but that union drives had to be conducted off of Defendant's property.[47]

Later that day, Farrell, Torres, and Mike Butler, who is a shift lead worker, met with Plaintiff to discuss his complaint about the work form on which someone had written a vulgarity.[48]  The supervisors accused Plaintiff of making false accusations.[49]  After the meeting, Plaintiff experienced weakness and drove himself to Defendant's health clinic.[50]  Plaintiff was hospitalized for two days, missing the remainder of his scheduled work week.[51]  He returned to work on Sunday, March 4, 2007.[52]

That Monday, Farrell again met with Plaintiff about Green's complaint.[53]  At another meeting on Tuesday, Kapinos and Farrell notified Plaintiff that he was suspended with pay pending the investigation into the complaint.[54]  At some point on Tuesday, Kapinos confronted Marcum and told him not to hand out union

---

[47]    Id. at pp. 1-2.

[48]    Plaintiff's Response, Ex. 2, Plaintiff's affidavit, ¶ 9.

[49]    Id.

[50]    Id.; Ex. 1, Plaintiff's deposition, pp. 47-48.

[51]    Plaintiff's Response, Ex. 2, Plaintiff's affidavit, ¶¶ 9, 10.

[52]    Id. at ¶ 11.

[53]    Id. at ¶ 12.

[54]    Id. at ¶ 13.

authorization cards[55] on Defendant's property.[56]   Kapinos said that
upper management would be "very unhappy" about the distribution on
work premises of union authorization cards.[57]

In a letter dated that same day, March 6, 2007, Farrell
reported on his investigation of Plaintiff's complaints.[58]   In
addition to the complaint about the vulgar inscription on the work
order, Plaintiff apparently complained that Theriault lodged a
hostile work environment claim against Plaintiff because Plaintiff
previously had spurned Theriault's sexual advances.[59]   Farrell
reported to Plaintiff that he had located and counseled the person
who wrote "fuckin" on the work order, but that the perpetrator
claimed he had left it crumpled in Plaintiff's truck.[60]   Neither
Farrell nor anyone else in management was willing to tell Plaintiff
who the perpetrator was.[61]   Farrell explained that he was unable to
identify who was responsible for unwadding the work form and

---

[55]   Union authorization cards are used to determine how much support
exists for an election to unionize.   See Plaintiff's Response, Ex. 3, Marcum's
affidavit, ¶ 6.

[56]   Id.

[57]   Id.

[58]   See Plaintiff's Response, Ex. 2, Plaintiff's affidavit, ¶ 14, Ex. B,
letter from Farrell to Plaintiff dated Mar. 6, 2007.

[59]   Plaintiff's Response, Ex. 2, Plaintiff's affidavit, Ex. B, letter
from Farrell to Plaintiff dated Mar. 6, 2007, p. 1.

[60]   See id. at pp. 1-2 (unnumbered).

[61]   See Plaintiff's Response, Ex. 1, Plaintiff's deposition, p. 87.

placing it on the brake pedal.[62]  Farrell was unable to substantiate Plaintiff's complaint regarding the hostile work environment claim.[63]

Several notable events occurred on March 16, 2007.  Early that morning, Defendant held a biannual meeting, called the Go Forward Meeting, at the start of the first shift of material specialists.[64] Marcum attended, and Farrell was the featured presenter on issues of benefits and human resources.[65]  Marcum stated, "Farrell began his discussion by stating that when he was a 'radical militant union organizer at Pan Am [Airlines]' he lost all his Pan Am stock and stock options when the airline went out of business."[66] Defendant conducted similar meetings at the start of each of the other shifts.[67]

Eric Foty ("Foty"), senior coordinator for Defendant's Aircraft on the Ground division, called Marcum later in the day and inquired about Plaintiff's suspension.[68]  After telling Marcum that

---

[62]    See Plaintiff's Response, Ex. 2, Plaintiff's affidavit, Ex. B, letter from Farrell to Plaintiff dated Mar. 6, 2007, p. 1 (unnumbered).

[63]    See id. at p. 2.

[64]    Plaintiff's Response, Ex. 3, Marcum's affidavit, ¶ 7.

[65]    Id.

[66]    Id.  The court assumes that Marcum intended to convey that Farrell blamed union activity for the airline's financial demise.

[67]    See id.

[68]    Id. at ¶ 8; see also Defendant's Reply, Docket Entry No. 22, Ex. 1, Kapinos affidavit, ¶ 4 (unnumbered)(correcting Marcum regarding Foty's job title and responsibilities).

11

Plaintiff's suspension was due to Plaintiff's union involvement, Foty warned Marcum to be careful because Marcum could be next and advised that, if Marcum and Plaintiff did not like their jobs, they should quit.[69]

March 16, 2007, was also the day that Plaintiff returned to work to meet with Farrell, at Farrell's request.[70]   Kapinos and Farrell presented Plaintiff with a letter outlining disciplinary measures Defendant was instituting against Plaintiff with regard to his behavior toward Green.[71]   Explaining that Farrell's investigation revealed that Plaintiff had circulated false information and rumors about Green, the letter indicated that Plaintiff's conduct violated company policy and the company's "commitment to treat each other with dignity and respect."[72] Kapinos considered the June 2006 suspension as a basis for heightened disciplinary action, stating that Plaintiff's "continued inappropriate behavior and [his] failure to correct [his] conduct"

---

[69]     Plaintiff's Response, Ex. 3, Marcum's affidavit, ¶ 8; see also id. at Ex. 1, Plaintiff's deposition, pp. 72-73.   Foty denies that such a conversation ever occurred.   See Defendant's Reply, Docket Entry No. 22, Ex. 3, Foty's affidavit.

[70]     Plaintiff's Response, Ex. 2, Plaintiff's affidavit, ¶ 15.

[71]     See Defendant's Motion, Ex. 2, Farrell's affidavit, ¶ 5 (unnumbered); Plaintiff's Response, Ex. 1, Plaintiff's deposition, p. 70; Ex. 1-A, letter from Kapinos to Plaintiff dated Mar. 16, 2007.

[72]     Plaintiff's Response, Ex. 1-A, letter from Kapinos to Plaintiff dated Mar. 16, 2007, p. 1; see also Defendant's Motion, Ex. 2, Farrell's affidavit, ¶ 5 (unnumbered).

warranted termination of Plaintiff's employment.[73] However, Kapinos was "willing to offer [Plaintiff] one final opportunity to continue [his] employment" if Plaintiff complied with certain terms and conditions.[74]

The most significant condition was the mandatory referral to Defendant's EAP.[75] Defendant required that Plaintiff report to its EAP for an evaluation and follow any recommended course of treatment.[76] Plaintiff could return to work from an unpaid suspension when Defendant's EAP released him back to duty.[77] Plaintiff signed, at Defendant's direction, an undated letter of resignation that would be used to terminate his employment if he failed to comply with the conditions.[78] Defendant placed Plaintiff on a "'Last Chance' Termination Warning level of discipline" for eighteen months.[79]

---

[73]   Plaintiff's Response, Ex. 1-A, letter from Kapinos to Plaintiff dated Mar. 16, 2007, p. 1.

[74]   Id.; see also Defendant's Motion, Ex. 2, Farrell's affidavit, ¶ 5 (unnumbered).

[75]   See Plaintiff's Response, Ex. 1-A, letter from Kapinos to Plaintiff dated Mar. 16, 2007, pp. 1-3 (unnumbered).

[76]   See id. at p. 2 (unnumbered).

[77]   See id.

[78]   See id.; Defendant's Motion, Ex. 2, Farrell's affidavit, ¶ 5 (unnumbered); Plaintiff's Response, Ex. 1-A, resignation letter.

[79]   See Plaintiff's Response, Ex. 1-A, letter from Kapinos to Plaintiff dated Mar. 16, 2007, p. 3 (unnumbered).

Union activity continued in Plaintiff's absence.  As part of the union drive, Marcum posted notices of a meeting to be held in the Teamsters' Union Hall.[80]  The notices repeatedly disappeared from the posted locations.[81]  Kapinos and Farrell held a meeting with all material specialists regarding the union drive.[82]  Farrell reiterated his past experience with union activity, and Kapinos instructed the employees "not to post any more notices of union meetings and not to discuss joining a union on company property" or they would face disciplinary actions.[83] Defendant never disciplined Marcum for his union activity.[84]

Plaintiff completed the required conditions on April 4, 2007, but Kapinos did not allow him to return to work until April 8, 2007.[85]  Plaintiff filed this lawsuit just a few days later, on April 11, 2007.  Defendant filed the pending motion in March of this year.  The court considers that motion now.

## II. Summary Judgment Standard

Summary judgment is warranted when the evidence reveals that no genuine dispute exists regarding any material fact and the

---

[80]     Plaintiff's Response, Ex. 3, Marcum's affidavit, ¶ 10.

[81]     Id.

[82]     Id.

[83]     Id.

[84]     See id. at ¶¶ 1-11; Ex. 1, Plaintiff's deposition, p. 73.

[85]     Plaintiff's Response, Ex. 2, Plaintiff's affidavit, ¶¶ 16-17.

moving party is entitled to judgment as a matter of law.  Fed. R.
Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986);
Brown v. City of Houston, Tex., 337 F.3d 539, 540-41 (5th Cir.
2003).  A material fact is a fact that is identified by applicable
substantive law as critical to the outcome of the suit.  Anderson
v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Ameristar Jet
Charter, Inc. v. Signal Composites, Inc., 271 F.3d 624, 626 (5th
Cir. 2001).  To be genuine, the dispute regarding a material fact
must be supported by evidence such that a reasonable jury could
resolve the issue in favor of either party.  Anderson, 477 U.S. at
250; TIG Ins. Co. v. Sedgwick James of Wash., 276  F.3d 754, 759 (5th
Cir. 2002).

      The movant must inform the court of the basis for the summary
judgment motion and must point to relevant excerpts from pleadings,
depositions, answers to interrogatories, admissions, or affidavits
that demonstrate the absence of genuine factual issues.  Celotex
Corp., 477 U.S. at 323; Topalian v. Ehrman, 954 F.2d 1125, 1131 (5th
Cir. 1992).  If the moving party can show an absence of record
evidence in support of one or more elements of the case for which
the nonmoving party bears the burden, the movant will be entitled
to summary judgment.  Celotex Corp., 477 U.S. at 322.  In response
to a showing of lack of evidence, the party opposing summary
judgment must go beyond the pleadings and proffer evidence that
establishes each of the challenged elements of the case,

demonstrating that genuine issues of material fact do exist that must be resolved at trial.  Id. at 324.

When considering the evidence, "[d]oubts are to be resolved in favor of the nonmoving party, and any reasonable inferences are to be drawn in favor of that party." Evans v. City of Houston, 246 F.3d 344, 348 (5th Cir. 2001); see also Boston Old Colony Ins. Co. v. Tiner Assocs. Inc., 288 F.3d 222, 227 (5th Cir. 2002).  The court should not "weigh evidence, assess credibility, or determine the most reasonable inference to be drawn from the evidence." Honore v. Douglas, 833 F.2d 565, 567 (5th Cir. 1987).

However, the nonmoving party must show more than "some metaphysical doubt as to the material facts." Meinecke v. H & R Block of Houston, 66 F.3d 77, 81 (5th Cir. 1995).  Conclusory allegations, unsubstantiated assertions, improbable inferences, unsupported speculation, or only a scintilla of evidence will not carry this burden.  Brown, 337 F.3d at 541; Ramsey v. Henderson, 286 F.3d 264, 269 (5th Cir. 2002).

### III.  Analysis

Defendant moves for summary judgment on Plaintiff's claims that Defendant violated the third and fourth subsections of 45 U.S.C. § 152 ("Section 152").  Plaintiff contends that fact issues preclude judgment at this juncture.

As a preliminary matter, Defendant objects to two affidavits submitted by Plaintiff because they are conclusory and subjective.

16

The court **OVERRULES** these objections.  Defendant also objects to the submission of a complaint attached to Marcum's affidavit because it is unclear with whom it was filed and because Defendant did not see the complaint prior to this lawsuit.  The court agrees that the complaint, which is entitled "Affidavit," but which lacks notarization, is not competent summary judgment evidence.  Neither the complaint nor Marcum's affidavit provide any information as to the nature of the complaint or the venue in which it was filed.  Defendant's objection is **SUSTAINED**, and the complaint attached to Marcum's affidavit is **STRICKEN** from the record.

### A.   Legal Overview

The RLA protects the rights of employees to engage in organized union activities without interference from their employer.  See Trans World Airlines, Inc. v. Indep. Fed'n, 489 U.S. 426, 440 (1989)(noting that the 1934 amendments to the RLA protect the employees' freedom to organize without company interference or pressure); Johnson v. Express One Int'l, 944 F.2d 247, 252 (5th Cir. 1991)(stating that "the RLA protects the employees' right to establish a union").  The protections of Section 152 extend to employees of all common carriers by air that engage in interstate or foreign commerce.  45 U.S.C. §§ 181, 182.

Section 152 (Third) states that representatives shall be designated "without interference, influence, or coercion" and that "no carrier shall, by interference, influence, or coercion seek in

any manner to prevent the designation by its employees as their representatives of those who or which are not employees of the carrier."  Section 152 (Fourth) focuses on the organization of a labor union:

> Employees shall have the right to organize and bargain collectively through representatives of their own choosing.  The majority of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class for the purposes of this chapter.  No carrier, its officers, or agents shall deny or in any way question the right of its employees to join, organize, or assist in organizing the labor organization of their choice, and it shall be unlawful for any carrier to interfere in any way with the organization of its employees, or to use the funds of the carrier in maintaining or assisting or contributing to any labor organization, labor representative, or other agency of collective bargaining, or in performing any work therefor, or to influence or coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor organization . . . .

Claims by employees of unlawful adverse employment actions arising under the RLA are evaluated according to a burden-shifting methodology that was originally developed under the National Labor Relations Act[86] ("NLRA").  <u>See</u> <u>Roscello v. Sw. Airlines Co.</u>, 726 F.2d 217, 222 (5th Cir. 1984).  The burden is initially on the employee to show that the employer's action was based on anti-union animus or, in other words, "that the employee's protected conduct was a substantial or motivating factor in the adverse action." <u>Id.</u> (quoting <u>N.L.R.B. v. Transp. Mgmt. Corp.</u>, 462 U.S. 393, 401 (1983), <u>overruled on other grounds</u>, 512 U.S. 267 (1994)).  If the employer

---

[86]     29 U.S.C. §§ 151-169.

responds with a legitimate business reason for its action, the question is whether that reason was bona fide or pretextual. Roscello, 726 F.2d at 222.  For cases in which the employer relied upon a legitimate reason, "the case is characterized as a 'dual-motive' one."  Id.  In such a case, fulfillment of the employee's initial burden is followed by a burden on the employer to show that the same action would have been taken even if the worker had not been involved in union activity.  Id. at 222-23.

The Fifth Circuit has recognized that direct evidence of anti-union animus is "a rarity at best" and, therefore, allows the consideration of circumstantial evidence.  Id. at 223 (quoting N.L.R.B. v. Brookwood Furniture, Div. of U.S. Indus., 701 F.2d 452, 465 (5th Cir. 1983)).  Factors to be considered in determining whether the employer was motivated by anti-union animus include: 1) temporal connectivity between the employer's action and the employee's union activity; 2) employee's past disciplinary record; 3) any other unfair labor practice in which the employer engages; 4) extent of investigation into conduct for which employee was disciplined; 5) comparison between employer's current disciplinary action and past practices; 6) plausibility of employer's explanation of its action; 7) consistency between employer's explanation and its other actions; and 8) seriousness of the

19

employee's violation.  <u>Tellepsen Pipeline Servs. Co. v. N.L.R.B.</u>, 320 F.3d 554, 565 (5th Cir. 2003).[87]

In <u>Roscello</u>, the Fifth Circuit found the evidence to be in conflict regarding whether the employee's union activity was a substantial and motivating factor in his employer's decision to fire him.  <u>Roscello</u>, 726 F.2d at 223.  Regarding the evidence favorable to a finding of anti-union animus, the court took particular note of what other employees had heard about the company's negative views on certain union activity, the offended employee's lengthy tenure without reprimand, and the temporal proximity between the employee's termination and his union activity.  <u>See</u> <u>id.</u>

**B.   <u>Discussion</u>**

In this case, the testimony of the witnesses, which is in conflict, raises a fact issue as to Defendant's motivation in disciplining Plaintiff.  On the one hand, Plaintiff's disciplinary

---

[87]     Rather than cite Fifth Circuit caselaw, the parties are content to put their faith in a 1996 Seventh Circuit case, <u>Lebow v. Am. Trans Air, Inc.</u>, 86 F.3d 661, 666 (7th Cir. 1996)(stating that an employee needs to demonstrate the following in order to show anti-union animus:  1) that he was involved in union activities; 2) that the employer knew of his union activity; 3) that the employer harbored animus toward union activity; and 4) that a connection existed between the employer's action and the employee's protected activities).  <u>See</u> Defendant's Motion, pp. 5-7; Plaintiff's Response, p. 14.  Although the approach to RLA cases that is articulated in <u>Lebow</u> is similar to that of the Fifth Circuit, it is neither the same nor binding on this court.  Defendant bases its motion on Plaintiff's failure to produce evidence in support of two of the four elements that the Seventh Circuit identifies as necessary to show anti-union motivation.  <u>See</u> Defendant's Motion, p. 7.  However, because Defendant fails to rely on the guidance of Fifth Circuit law, it fails to demonstrate that it is entitled to judgment as a matter of law.  Instead of basing this decision on that infirmity, however, the court applies Fifth Circuit law to the facts and finds that Defendant also fails to meet the first half of its burden, to wit, that no genuine dispute of fact exists.

record was not spotless over the ten years of employment.  He was disciplined in June 2006, before he engaged in union activity, for showing his supervisor disrespect.  Tension between Plaintiff and his supervisor resurfaced several months later.  Shortly thereafter, a coworker complained that Plaintiff was harassing her about unionizing and was spreading rumors about her.  After an investigation, Defendant meted out discipline that was more severe than its prior intervention.  Arguably, then, Defendant relied upon a legitimate reason in disciplining Plaintiff.

On the other hand, Plaintiff's disciplinary record over his almost ten-year tenure also was not rife with conduct interventions.  Notably, the investigation into Plaintiff's alleged harassment of a coworker began two days after he and Marcum had met with union representatives.  The complaint related to union activity and spawned a rather lengthy and in-depth investigation.

By way of contrast, Plaintiff's complaints regarding a vulgar note and past sexual harassment involved less investigation, fewer meetings, incomplete resolution, and no discipline.  Moreover, Defendant refused to tell Plaintiff who the perpetrator was and did not offer any indication as to the motivation.

It is undisputed that those individuals disciplining Plaintiff knew of his union activity.  Comments and reactions of Kapinos, Farrell, and others with regard to union activity, which were within days and weeks of Plaintiff's meeting with union

21

representatives, are open to the inference of animus.  For example, Kapinos told Marcum that upper management would be "very unhappy" to find out that Marcum was distributing union cards on Defendant's property.  Farrell took the opportunity on more than one occasion to reveal that he had been involved in union activity when employed by another airline and, on at least one occasion, impliedly connected union activity to his loss of stock when the company folded.  Foty remarked to Marcum that Plaintiff's discipline was connected to his union activity, warned Marcum that he could be next, and suggested that he and Plaintiff quit if that were unhappy.[88]

Kapinos and Farrell reacted quickly to any union activity, informing employees, individually and in meetings, of Defendant's policy against solicitation on company property and threatening discipline against violators.  Notices related to union organization repeatedly disappeared shortly after posting.  Kapinos instructed the material specialists not to post any union notices to discuss the topic on company property.

In light of these facts, Defendant has failed to show that the it would have taken the same action even if Plaintiff had not been involved in union activity.  That said, the evidence is far from conclusive that Defendant harbored animus toward unionization; in

---

[88]   The fact that Foty denies these remarks simply emphasizes the existence of genuine issues of material fact.

fact, the evidence could be argued to a contrary result.  This is the nature of disputed facts.  The bottom line is that Plaintiff has produced enough evidence to allow a reasonable jury to resolve the issue in his favor, should it so decide.  Thus, summary judgment is inappropriate.

## V.  Conclusion

Based on the foregoing, the court **DENIES** Defendant's motion for summary judgment.

**SIGNED** in Houston, Texas, this 7th day of October, 2008.

Nancy K. Johnson
United States Magistrate Judge